# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **07-00280-CR-W-HFS** |
| Alfredo Cisneros-Gutierrez, | ) | |
| Gerardo Cisneros Gutierrez, | ) | |
| Alfonso Cisneros Gutierrez, | ) | |
| Miguel Angel Garcia-Bobadilla, | ) | |
| Justino Ruiz-Ramos, and | ) | |
| Salvador Jesus Velasco-Saldaña, | ) | |
| | ) | |
| Defendants. | ) | |

## Report and Recommendation

Pending before the Court are respective motions filed by the six defendants in this criminal action, to wit:

(1) the MOTION TO SUPPRESS EVIDENCE filed October 24, 2007 (Doc. #65) by defendant Alfredo Cisneros-Gutierrez;

(2) the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed October 14, 2007 (Doc. #56) by defendant Gerardo Cisneros-Gutierrez;

(3) the AMENDED MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed October 15, 2007 (Doc. #57) by defendant Alfonso Cisneros-Gutierrez;

(4) the MOTION TO SUPPRESS EVIDENCE filed October 30, 2007 (Doc. #67) by defendant Miguel Angel Garcia-Bobadilla ("Garcia-Bobadilla");

(5) the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed August 29, 2007 (Doc. #50) by defendant Justino Ruiz-Ramos ("Ruiz-Ramos"); and

(6) the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed August 28, 2007 (Doc. #48) by defendant Salvador Jesus Velasco-Saldaña ("Velasco-Saldaña").

On November 5 and December 19, 2007, the undersigned held an evidentiary hearing on all of the defendants' motions. At that hearing, Alfredo Cisneros-Gutierrez was present and was represented by his counsel, Bruce Houdek. Gerardo Cisneros-Gutierrez was present and was represented by his counsel, Jack West. Alfonso Cisneros-Gutierrez was present and was represented by his counsel, John M. Simpson. Garcia-Bobadilla was present and was represented by his counsel, Daniel Hobart. Ruiz-Ramos was present and was represented by his counsel, Thomas R. Fields. Velasco-Saldaña was present and was represented by his counsel, Henri Watson. The Government was represented by Assistant United States Attorney Amy Marcus.

At the evidentiary hearing, the Government called Special Agent Mark King of the U.S. Immigration and Customs Enforcement and Detective Luis Ortiz of the Kansas City Missouri Police Department. Testifying for the defendants at the hearing were Mr. Manuel Ortiz as well as five of the six defendants (the only defendant not testifying was Gerardo Cisneros-Gutierrez). Several exhibits were admitted into evidence, including:

| | |
|---|---|
| Gov't #1 | Consent to search form [Salvador Jesus Velasco-Saldaña] |
| Gov't #2 | Consent to search form [Alfredo Cisneros-Gutierrez] |
| Gov't #3 | Consent to search form [Miguel Angel Garcia-Bobadilla] |
| Gov't #4 | *Miranda* waiver form [Salvador Jesus Velasco-Saldaña] |
| Gov't #5 | *Miranda* waiver form [Justino Ruiz-Ramos] |
| Gov't #6 | *Miranda* waiver form [Miguel Angel Garcia-Bobadilla] |
| Gov't #7 | *Miranda* waiver form [Alfredo Cisneros-Gutierrez] |
| Gov't #8 | *Miranda* waiver form [Gerardo Cisneros-Gutierrez] |
| Gov't #9 | *Miranda* waiver form [Alfonso Cisneros-Gutierrez] |
| Def't #11-16 | Photographs of 323 South Brighton |
| Gov't #17 | Search warrant application and affidavit |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

2

# PROPOSED FINDINGS OF FACT[1]

1.      In July of 2007, Mark R. King was a Special Agent with the U.S. Immigration and Customs Enforcement assigned to the investigation of immigration and customs laws.  Tr. at 10.

2.      In July of 2007, Luis Ortiz was a Detective with the Gang Narcotics Squad ("Gang Unit") of the Kansas City Missouri Police Department.  Tr. at 232-33.

3.      On July 11, 2007, a confidential informant provided Special Agent King with information that there was a Mexican national male (name unknown) with connections to California, driving a black Volkswagen Jetta, who was anticipating a large shipment of crystal methamphetamine coming into Kansas City.  Tr. at 10-11, 82, 141-43, 233, 274.

4.      The next day, on July 12, 2007, the confidential informant again contacted Special Agent King and informed him that the above-described Mexican national was staying at 323 South Brighton Avenue in Kansas City, in an apartment on the bottom level of the residence.  Tr. at 11, 79-80, 82, 103-05, 233.

5.      Thereafter, Special Agent King initiated surveillance of the residence at 323 South Brighton Avenue.  Tr. at 11-12, 80.

6.      At approximately 12:40 p.m. on July 12, 2007, Special Agent King observed a black Volkswagen Jetta coming from the area of the residence.  Tr. at 12, 80-81.

7.      The black Volkswagen Jetta drove to a nearby store and then continued on, but later the same black Volkswagen Jetta returned to 323 South Brighton Avenue and the Hispanic male driver – later identified as Ruiz-Ramos – exited the vehicle and entered the residence.  Tr. at 12-13, 80-82, 114, 234, 276-77.

---

[1]      To compile proposed findings of fact, the Court was required to make credibility determinations, in particular to resolve discrepancies between the testimony of Special Agent King and Detective Ortiz, on one hand, and Manuel Ortiz and the five testifying defendants, on the other hand.  In making such determinations, the undersigned considered (1) the demeanor of the witnesses on the stand; (2) the interest the witnesses had in the outcome of the motion; (3) the opportunity of the witnesses to hear, observe, and recall what was said or done; and (4) any conflicts within a given witness' testimony.  With these factors in mind, the Court found that testimony of Special Agent King and Detective Ortiz was credible, while the testimony given by the other witnesses was not largely credible.  Non-credible testimony and testimony touching on matters not material to the pending motions to suppress are not included in the proposed findings of fact.

3

8.      At the same time that the black Volkswagen Jetta was arriving at the residence, members of the Kansas City Missouri Police Department's Gang Unit [Detective Miller, Detective Bax, Sergeant Pruetting as well as Detective Ortiz] arrived at the location.  Tr. at 12-13, 102-03, 234, 275-76.

9.      Special Agent King can communicate effectively in Spanish and Detective Ortiz is fluent in Spanish.  Tr. at 174-75.

10.     Thereafter, Special Agent King and Detective Ortiz knocked on the front door at 323 South Brighton Avenue.  Tr. at 13, 85, 114, 234-35, 277.

11.     After no one responded for 30 to 60 seconds (while the sounds of doors being closed inside the residence could be heard), the front door was finally opened by Ruiz-Ramos. Tr. at 13, 85-86, 235, 277-78.

12.     The officers identified themselves as immigration agents and police, stated that they were conducting a narcotics investigation, and asked if they could come in and talk with Ruiz-Ramos.  Tr. at 13-14, 86-89, 235, 277-78.

13.     Ruiz-Ramos opened the door, stepped back and then stepped to the side to allow the officers entrance into a common area[2] of the building.  Tr. at 14-15, 87-88, 236, 278-79, 304, 396-97.

14.     After noting that they were in a common area , the officers saw an apartment door to the left inside the front door.  Tr. at 14-15.

15.     Based on the sounds heard before the common area door was opened by Ruiz-Ramos, the officers believed that he had come out of the apartment before opening the common area door.  Tr. at 281.

16.     The officers asked Ruiz-Ramos if they could step into the apartment.  Tr. at 14-15, 88-89, 236.

17.     Ruiz-Ramos stated that he did not live in the apartment, that he was trying to visit a friend named Salvador (or Chalva) who was not home, and that he (Ruiz-Ramos) lived at 309 Lawndale.  Tr. at 14-15, 88-89, 98-99, 236-37, 279-80.

18.     Detective Ortiz then knocked on the apartment door, announcing "Police," but nobody answered.  Tr. at 14-16, 237-38, 282-83, 299.

---

[2]      During the hearing, this common area was also described as a breezeway.  The house at 323 South Brighton is essentially divided into two separate apartments – one on the first floor and one on the second floor.

4

19.     The officers knew the black Volkswagen Jetta was registered for the address of 509 Lawndale (similar to the address given by Ruiz-Ramos of 309 Lawndale).  Tr. at 14-15, 237, 280.

20.     Special Agent King then asked Ruiz-Ramos if he meant that he lived at 509 Lawndale, but Ruiz-Ramos continued to state that he resided at 309 Lawndale and denied that he resided in the apartment at 323 South Brighton Avenue.  Tr. at 14-15.

21.     Special Agent King then asked Ruiz-Ramos is he had any keys on him and asked Ruiz-Ramos if he could try the keys on the apartment door.  Tr. at 14-16, 89, 98-99, 115, 118, 237.

22.     Special Agent King and Detective Ortiz were skeptical of Ruiz-Ramos' truthfulness and wanted to see if Ruiz-Ramos was being truthful about the apartment.  Tr. at 14-16, 89-91, 93, 115, 237, 280-81, 297.

23.     Ruiz-Ramos agreed that the officers could try the keys.  Tr. at 14-16, 89-90, 115, 237.

24.     While Detective Ortiz tried the keys, he watched Ruiz-Ramos and became concerned, finally saying something to the effect: "There has got to be something wrong.  He is acting really nervous.  He is looking at my weapon and he [is] acting bizarre."  Tr. at 14-16, 97, 238-39, 283-84.

25.     Special Agent King could see that Ruiz-Ramos was visibly upset and was "act[ing] in a manner that [law enforcement officers] routinely observe when somebody is really nervous about possibly [having] done something wrong."  Tr. at 14-17, 97, 122-23.

26.     Special Agent King then handcuffed Ruiz-Ramos in the common area for purposes of officer safety.  Tr. at 17, 92, 94, 97, 122, 239-40.

27.     Special Agent King considered that Ruiz-Ramos was temporarily in "investigative detention" and that he was not free to leave.  Tr. at 73, 92.

28.     The officers did not have weapons drawn.  Tr. at 20, 93.

29.     The officers then continued trying the keys on the apartment door and found one of Ruiz-Ramos' keys that opened the lock.  Tr. at 18, 91, 115-16, 284-85.

30.     The officers did not open the door themselves.  Tr. at 20, 285, 299.

31.     After a moment, a Hispanic male (later identified as Velasco-Saldaña) opened the apartment door from the inside.  Tr. at 19, 240, 285, 300.

5

32.     Special Agent King and Detective Ortiz immediately noted that Velasco-Saldaña had spider webs and debris in his hair.  Tr. at 19, 120, 241, 305-06.

33.     When asked about it, Velasco-Saldaña said it was "Nothing" and began brushing his hair with his hand.  Tr. at 19, 241.

34.     Special Agent King then told Velasco-Saldaña that the officers were conducting a narcotics investigation and asked Velasco-Saldaña if they could come into the apartment and talk to him.  Tr. at 19, 119, 121-22, 240-41, 300.

35.     Special Agent King asked Velasco-Saldaña if he lived in the apartment and Velasco-Saldaña said that he did.  Tr. at 22, 129-30, 241-42, 396.

36.     Velasco-Saldaña said that the officers could come into the apartment and he allowed the officers into the apartment.  Tr. at 19, 119, 121-22, 240-41, 300, 304, 396.

37.     The officers did not have weapons drawn.  Tr. at 19-20.

38.     The officers did not push Velasco-Saldaña out of the way when he answered the door or use any physical force.  Tr. at 240, 303.

39.     The officers asked Velasco-Saldaña if there was anyone else in the apartment and he said "No."  Tr. at 20, 126, 241.

40.     For reasons of officer safety, the officers then asked Velasco-Saldaña if they could look in the apartment to make sure no one else was present and Velasco-Saldaña agreed.  Tr. at 21, 125-26, 241.

41.     Detective Ortiz then did a quick sweep of the apartment to confirm that no one else was present.  Tr. at 130, 242, 286.

42.     Velasco-Saldaña then gave verbal consent to the officers to search the apartment and signed a written consent to search form and told the officers that there were no drugs, guns, or large sums of cash in the apartment.  Tr. at 22-23, 130, 242, 308-09; Gov't #1.

43.     The consent form was in English but was explained to Velasco-Saldaña by Detective Ortiz.  Tr. at 23, 136-37, 242-43, 309-10.

44.     Velasco-Saldaña stated that he understood what he was signing and understood his rights in giving consent.  Tr. at 23, 244.

45.     Velasco-Saldaña was not coerced, threatened or intimidated in giving the consent.  Tr. at 23-24, 243.

6

46.     The officers did not have any physical contact with Velasco-Saldaña in obtaining the consent.  Tr. at 24.

47.     The officers did not make any promises or representations to Velasco-Saldaña in obtaining the consent.  Tr. at 24, 244.

48.     The officers did not brandish any weapons in obtaining the consent from Velasco-Saldaña.  Tr. at 24, 127, 243.

49.     Velasco-Saldaña did not appear to be intoxicated or under the influence of drugs at the time the consent was given.  Tr. at 24, 244.

50.     Thereafter, officers began searching the apartment.  Tr. at 25, 139, 244.

51.     At no point during the search did Velasco-Saldaña object to the search or request the search be stopped.  Tr. at 24, 244.

52.     While the apartment was being searched, Special Agent King asked Ruiz-Ramon why he had a key to the apartment and Ruiz-Ramon initially stated that he did not know, but then later said that the apartment key was already on a key ring he obtained when he purchased his black Volkswagen Jetta.  Tr. at 71.

53.     While the apartment was being searched, Special Agent King asked Velasco-Saldaña questions to establish his relationship to the apartment.  Tr. at 124.

54.     The search yielded several incriminating matters including a firearm and 1,362 grams of crystal methamphetamine.  Tr. at 69, 73-74.

55.     Thereafter, Ruiz-Ramos and Velasco-Saldaña were placed under arrest.  Tr. at 69-70.

56.     The next day, July 13, 2007, Velasco-Saldaña was questioned by Special Agent King and Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights and signing a written *Miranda* waiver form.  Tr. at 53-54, 56, 263-64, 311.

57.     Velasco-Saldaña read the *Miranda* waiver (which was in Spanish) back to the officers and told the officers he understood his rights.  Tr. at 55-57, 263-64, 312; Gov't #4.

58.     The officers did not threaten Velasco-Saldaña with any prison sentences if he refused to sign a *Miranda* waiver.  Tr. at 54-56.

59.     Velasco-Saldaña was not forced, intimidated or threatened by the officers prior to giving his statement.  Tr. at 57, 264, 313-14.

7

60.     In giving his statement, Velasco-Saldaña never requested a lawyer and never requested that the questioning be stopped.  Tr. at 57, 264-65.

61.     The next day, July 13, 2007, Ruiz-Ramos was questioned by Special Agent King and Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights and signing a written *Miranda* waiver form.  Tr. at 26-27, 53-54, 57, 262, 287.

62.     Ruiz-Ramon read the *Miranda* waiver (which was in Spanish) back to the officers and told the officers he understood his rights.  Tr. at 57-58, 262-63, 288; Gov't #5.

63.     Ruiz-Ramos did not refuse to answer any questions.  Tr. at 263.

64.     The officers questioning Ruiz-Ramos did not threaten or intimidate him.  Tr. at 263, 288.

65.     The officers questioning Ruiz-Ramos did not engage in any deception with him or make any promises to him.  Tr. at 263, 288.

66.     Ruiz-Ramos did not ask for a lawyer.  Tr. at 263, 289.

67.     Ruiz-Ramos did not request that the questioning be stopped.  Tr. at 263.

68.     Ruiz-Ramos told officers that he had purchased three pounds of crystal methamphetamine from a Mexican male nicknamed "Pudrcas" and that the man's brother delivered the crystal methamphetamine in a white Malibu.  Tr. at 26-27, 143-44, 318-19, 330.

69.     Ruiz-Ramos did not know an address for "Pudrcas" and his brother, but assisted the officers in drawing a map.  Tr. at 26-27, 144, 182, 245, 331.

70.     From the map, the officers determined that the address described by Ruiz-Ramos was 430 Donnelly Avenue.  Tr. at 27-28, 245.

71.     On July 24, 2007, Special Agent King and Detective Ortiz traveled to 430 Donnelly, knocked on the door, and identified themselves as law enforcement officers.  Tr. at 28, 146, 245-47, 344.

72.     The door was answered by Garcia-Bobadilla.  Tr. at 28, 148, 179, 344.

73.     The officers identified themselves to Garcia-Bobadilla and asked if they could come inside to talk.  Tr. at 28-29, 148, 247.

74.     Garcia-Bobadilla told the officers that they could come in to talk.  Tr. at 29, 148, 179-80, 247, 345.

8

75.     The officers did not threaten Garcia-Bobadilla or push him out of the way when he opened the door.  Tr. at 251.

76.     The officers asked Garcia-Bobadilla if there was anyone else in the residence and he said that there was no one else in the residence.  Tr. at 29-30, 149, 247, 339, 345.

77.     The officers asked Garcia-Bobadilla if they could check the house to make sure that no one else was present and Garcia-Bobadilla said the officers could check.  Tr. at 30, 32-33, 149, 247.

78.     An officer then checked the residence and found Alfredo Cisneros-Gutierrez and Dheli Hernandez-Pena (a female) in the house.  Tr. at 30, 149-50, 180, 248, 339.

79.     All three individuals (Garcia-Bobadilla, Alfredo Cisneros-Gutierrez and Ms. Hernandez-Pena) then were seated on a couch in the living room of the house.  Tr. at 30, 150-51.

80.     Special Agent King then questioned the three individuals to determine who lived at the residence.  Tr. at 30-31.

81.     Garcia-Bobadilla and Alfredo Cisneros-Gutierrez both stated that they lived at the house, while Ms. Hernandez-Pena stated that she was just visiting and had spent the night.  Tr. at 30-31, 249.

82.     Special Agent King asked Garcia-Bobadilla and Alfredo Cisneros-Gutierrez for consent to search the residence and both consented verbally and by signing  written consent to search forms.  Tr. at 31, 158, 249, 334-35; Gov't #2.

83.     The consent form was in English but was explained to Garcia-Bobadilla and Alfredo Cisneros-Gutierrez by Detective Ortiz in Spanish.  Tr. at 32, 249, 334-36.

84.     Garcia-Bobadilla and Alfredo Cisneros-Gutierrez were not coerced, threatened or intimidated in giving the consent.  Tr. at 32, 250.

85.     The officers did not make any promises or misrepresentations to Garcia-Bobadilla and Alfredo Cisneros-Gutierrez in obtaining the consent.  Tr. at 34, 250.

86.     The officers did not threaten to tear the house apart if there was no consent.  Tr. at 155, 327.

87.     The officers did not brandish any weapons in obtaining the consent from Garcia-Bobadilla and Alfredo Cisneros-Gutierrez.  Tr. at 34, 155, 250.

88.     Neither Garcia-Bobadilla nor Alfredo Cisneros-Gutierrez appeared to be intoxicated or under the influence of drugs at the time the consent was given.  Tr. at 34, 250.

89.     Thereafter, officers began searching the residence.  Tr. at 34, 250.

90.     At no point during the search did either Garcia-Bobadilla or Alfredo Cisneros-Gutierrez object to the search.  Tr. at 34, 250-51.

91.     The search of the residence at 430 Donnelly yielded illegal drugs, including 470 gross grams of methamphetamine in the basement rafters.  Tr. at 37-39.

92.     Thereafter, Garcia-Bobadilla, Alfredo Cisneros-Gutierrez and Ms. Hernandez-Pena were placed under arrest.  Tr. at 151-52.

93.     That same day, July 24, 2007, Garcia-Bobadilla was questioned by Special Agent King and Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights and signing a written *Miranda* waiver form.  Tr. at 60-61, 183, 265.

94.     Garcia-Bobadilla read the *Miranda* waiver (which was in Spanish) back to the officers and told the officers he understood his rights.  Tr. at 61-62, 183, 265; Gov't #6.

95.     Garcia-Bobadilla was not intimidated or threatened by the officers prior to giving his statement.  Tr. at 62-63, 266.

96.     The officers did not use any deception or misrepresentations in obtaining Garcia-Bobadilla's waiver of his *Miranda* rights.  Tr. at 62, 266.

97.     The officers did not brandish their weapons while obtaining Garcia-Bobadilla's waiver of his *Miranda* rights.  Tr. at 63.

98.     Garcia-Bobadilla did not ask for a lawyer, did not ask for clarification of his rights, and did not ever ask for the questioning to be stopped.  Tr. at 62, 183, 266.

99.     That same day, July 24, 2007, Alfredo Cisneros-Gutierrez was questioned by Special Agent King and Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights and signing a written *Miranda* waiver form.  Tr. at 63-64, 160-61, 267.

100.     Alfredo Cisneros-Gutierrez read the *Miranda* waiver (which was in Spanish) back to the officers and told the officers he understood his rights.  Tr. at 63-65, 267; Gov't #7.

101.     Alfredo Cisneros-Gutierrez was not threatened or coerced by the officers prior to giving his statement.  Tr. at 65, 267-68.

10

102.     Alfredo Cisneros-Gutierrez did not act confused and appeared to understand his rights.  Tr. at 65.

103.     Alfredo Cisneros-Gutierrez did not ask for a lawyer, did not ask for clarification of his rights, and did not ever ask for the questioning to be stopped.  Tr. at 66, 267.

105.     That same day, July 24, 2007, Ms. Hernandez-Pena told Detective Ortiz that she was the girlfriend of Alfredo Cisneros-Gutierrez, that she  wanted to cooperate, that there was another house in Kansas City where Alfredo Cisneros-Gutierrez' brothers were living and where large amounts of drugs and a cache of weapons were kept, and that the people were enforcers for a drug organization.  Tr. at 37-38, 169, 186-87, 192, 251-52, 353.

106.     According to Ms. Hernandez-Pena she had accompanied Alfredo Cisneros-Gutierrez to this other house before and had personally observed the drugs and weapons.  Tr. at 38.

107.     Officers then drove Ms. Hernandez-Pena through the area where she said the other house was located and she identified the residence at 3907 East 12th Terrace.  Tr. at 39-40, 187, 252, 354.

108.     Subsequently that day, July 24, 2007, the officers announced themselves and knocked on the front door at 3907 East 12th Terrace.  Tr. at 40, 188, 192-93, 252-53, 355, 371.

109.     No one answered the door, instead an individual (later identified as Gerardo Cisneros-Gutierrez) began speaking to Detective Ortiz through a side window.  Tr. at 41, 193, 252-53, 355.

110.     Detective Ortiz identified himself and Special Agent King, told Gerardo Cisneros-Gutierrez they were conducting a narcotics investigation, and asked if the officers could come into the house.  Tr. at 42, 193-94, 253.

111.     While talking to Gerardo Cisneros-Gutierrez through the window, Detective Ortiz observed another individual (later identified as Alfonso Cisneros-Gutierrez) in the house and saw the man intermittently talking with Gerardo Cisneros-Gutierrez and attempting to flush something down the kitchen sink.  Tr. at 44, 195-96, 254-55, 355-57, 395.

112.     Special Agent King then looked through a window set into the front door of the residence and saw Alfonso Cisneros-Gutierrez go into a back room, shut the door, then exit the room carrying something, and then "scurry" and disappear from Special Agent King's field of vision.  Tr. at 44-45, 195-96, 198-99, 255.

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 11 of 32

113.     Special Agent King then saw Alfonso Cisneros-Gutierrez reappear, go back into the back room, again shut the door, then again exit the room carrying something, and then again "scurry" and disappear from Special Agent King's field of vision.  Tr. at 45-46.

114.     By now, Special Agent King and Detective Ortiz believed Alfonso Cisneros-Gutierrez was destroying evidence while Gerardo Cisneros-Gutierrez was stalling the officers.  Tr. at 45-46, 196-97, 257, 398.

115.     Then Alfonso Cisneros-Gutierrez started to open the front door, but when the officers started to enter, the door was slammed shut.  Tr. at 48, 197, 256-57, 357.

116.     At that point, Special Agent King believed that evidence was being destroyed and that exigent circumstances existed to enter the house.  Tr. at 48-49, 196, 394.

117.     Subsequently, the door was opened from the inside by one of the occupants and the officers entered the house, secured – by handcuffing – Gerardo Cisneros-Gutierrez and Alfonso Cisneros-Gutierrez, and swept the house.  Tr. at 50-51, 200, 202-05, 258-59, 358-61.

118.     In sweeping the house for other occupants, officers found assault-styled weapons in a closet, plastic bags containing crystal-like substances and a large amount of U.S. currency.  Tr. at 51, 259.

119.     Thereafter, the house was secured and Gerardo Cisneros-Gutierrez and Alfonso Cisneros-Gutierrez were detained while Special Agent King and Detective Ortiz applied for and obtained a search warrant.  Tr. at 51, 167-69, 212, 259-60, 362-63; Def't # 17.

120.     The ensuing search of 3907 East 12th Terrace yielded several items including 8,605 grams of crystal methamphetamine, $120,987 in currency, and several weapons; Gerardo Cisneros-Gutierrez and Alfonso Cisneros-Gutierrez were thereafter arrested.  Tr. at 52-53.

121.     That next day, July 25, 2007, Alfonso Cisneros-Gutierrez was questioned by Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights and signing a written *Miranda* waiver form.  Tr. at 268, 363.

122.     Defective Ortiz read the *Miranda* waiver (which was in Spanish) to Alfonso Cisneros-Gutierrez and Alfonso Cisneros-Gutierrez told the officers he understood his rights.  Tr. at 268-69, 363, 365; Gov't #9.

123.     Alfonso Cisneros-Gutierrez was not threatened or coerced by the officers prior to giving his statement.  Tr. at 269.

124.     Alfonso Cisneros-Gutierrez did not act confused and appeared to understand his rights.  Tr. at 268-69.

125.     Alfonso Cisneros-Gutierrez did not ask for a lawyer, did not ask for clarification of his rights, and did not ever ask for the questioning to be stopped.  Tr. at 269.

126.     That same day, July 24, 2007, Gerardo Cisneros-Gutierrez was questioned by Detective Ortiz at the Kansas City Missouri Police Headquarters after being informed of his *Miranda* rights.  Tr. at 269-70.

127.     Gerardo Cisneros-Gutierrez refused to sign a written *Miranda* waiver (which was in Spanish and read to him by Detective Ortiz), but agreed to speak with officers.  Tr. at 270; Gov't #8.

128.     Gerardo Cisneros-Gutierrez was not threatened or coerced by the officers prior to giving his statement.  Tr. at 272.

129.     Gerardo Cisneros-Gutierrez did not act confused and appeared to understand his rights.  Tr. at 270.

130.     Gerardo Cisneros-Gutierrez did not ask for a lawyer, did not ask for clarification of his rights, and did not ever ask for the questioning to be stopped.  Tr. at 272.

## PROPOSED CONCLUSION OF LAW

This case is akin to a game of dominoes.  First, acting on a tip from a confidential informant, law enforcement officers conduct a "knock and talk" at 323 South Brighton which leads to the eventual arrest and questioning of Ruiz-Ramos and Velasco-Saldaña.  Then, based on information obtained in that investigation, law enforcement officers conduct a "knock and talk" at 430 Donnelly Avenue which leads to the eventual arrest and questioning of Garcia-Bobadilla and Alfredo Cisneros-Gutierrez. Then, based on information obtained in that investigation, law enforcement officers conduct a "knock and talk" at 3907 East 12th Terrace which leads to the eventual arrest and questioning of Gerardo Cisneros-Gutierrez and Alfonso

13

Cisneros-Gutierrez. In their respective motions to suppress, the defendants argue that at several points during this chain of events law enforcement officers violated the Fourth Amendment and/or the Fifth Amendment of the United States Constitution. More specifically:

- Ruiz-Ramos argues that law enforcement officers searched 323 South Brighton without a warrant and without any grounds to conduct a warrantless search, and his subsequent statements to law enforcement officers were obtained without a voluntary waiver of his *Miranda* rights [Doc. 50];

- Velasco-Saldaña argues that law enforcement officers searched 323 South Brighton without a warrant and without any grounds to conduct a warrantless search, he did not voluntarily consent to a search of 323 Brighton, and his subsequent statements to law enforcement officers were obtained without a voluntary waiver of his *Miranda* rights [Doc. 48, 49];

- Garcia-Bobadilla argues that law enforcement officers searched 430 Donnelly without a warrant and without any grounds to conduct a warrantless search, he did not voluntarily consent to a search of 430 Donnelly, and his subsequent statements to law enforcement officers were obtained without a voluntary waiver of his *Miranda* rights [Doc. 67];

- Alfredo Cisneros-Gutierrez argues that law enforcement officers searched 430 Donnelly without a warrant and without any grounds to conduct a warrantless search, and he did not voluntarily consent to a search of 430 Donnelly [Doc. 65, 75]

- Gerardo Cisneros-Gutierrez argues that law enforcement officers searched 3907 East 112th Terrace without a warrant and without any grounds to conduct a warrantless search and, to the extent exigent circumstances were present, the circumstances were created by law enforcement officers [Doc. 50, 59]; and

- Alfonso Cisneros-Gutierrez argues that law enforcement officers searched 3907 East 112th Terrace without a warrant and without any grounds to conduct a warrantless search, the search warrant

14

issued to search 3907 East 112th Terrace lacked probable cause, the protective sweep of 3907 East 112th Terrace was unjustified, and his subsequent statements to law enforcement officers were obtained without a voluntary waiver of his *Miranda* rights [Doc. 57, 58, 72].

The government responds that the actions of law enforcement officers were undertaken without violating the Constitutional rights of any of the defendants [Doc. 66, 76]. The Court agrees.

## A.  The events at 323 South Brighton

On July 12, 2007, law enforcement officers approached the front door of 323 South Brighton and knocked on the front door. Thereafter, Ruiz-Ramos opened the door. When the officers asked if they could come in the door, Ruiz-Ramos stepped back and to the side to allow the officers to enter the house. By these actions, Ruiz-Ramos effectively communicated his consent to the officers' entry into 323 South Brighton. With regard to this initial confrontation, however, the defendants argue that Ruiz-Ramos did not have authority to consent to the officers entering the front door at 323 South Brighton. To that end, the record does not reflect that Ruiz-Ramos had any ownership or leasehold interest in 323 South Brighton. However, this fact does necessarily resolve the consent issue.

> Consent is a valid exception to the warrant requirement . . . and may be given either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched. . . .  In determining a third party's authority to consent, the officers must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent.

*United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). *See also United States v. Pennington*, 287 F.3d 739, 746-47 (8th Cir.2002) (stating that "[t]he critical facts ... are not the actual

15

relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent." (*citation and internal quotations omitted*)).

In this case, the officers arriving at the front door of 323 South Brighton had previously seen Ruiz-Ramos leave the house in his car and then return to the house. In addition, immediately before Ruiz-Ramos opened the (locked) front door, officers heard an interior door close, giving the officers the reasonable impression that Ruiz-Ramos had been in the first floor apartment. Moreover, after the officers identified themselves and asked to enter the building, Ruiz-Ramos allowed them in[3] and did not tell the officers that he had no authority to permit them to enter the house (as he did later with the apartment). Under these circumstances, the officers reasonably believed that Ruiz-Ramos had authority to (and did) consent to their entry into the front door of 323 South Brighton.

It is not clear that any objections have been lodged with regard to the ensuing interaction between the officers and Ruiz-Ramos. In any event, the Court finds that the encounter was consensual and Ruiz-Ramos voluntarily gave the officers his keys to try on the apartment door.

> Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

---

[3]    *See, e.g.*, *United States v. Cedano-Medina*, 366 F.3d 682, 686 (8th Cir. 2004) (officer had a reasonable belief that consent had been granted where the defendant opened the door to his truck, stood to the side and allowed officers to look in the truck, and never attempted to stop or object to the search); *United States v. Mendoza-Cepeda*, 250 F.3d 626, 627-629 (8th Cir. 2001) (law enforcement reasonably viewed the defendant's gestures as consent to a search).

16

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001).[4]  Moreover, Ruiz-Ramos' subsequent

behavior reasonably raised concerns of officer safety at the scene and justified the handcuffing of

Ruiz-Ramos while the officers continued trying to get someone to answer the apartment door.

*Compare United States v. Sanders*, 424 F.3d 768, 782 (8th Cir. 2005) ("[the defendant's] erratic

behavior as [the officer] was about to discover the contraband indicated that safety precautions

might be necessary [justifying] placing [the defendant] in handcuffs [even though] he was not

under arrest but was placed in restraints as a safety precaution").

　　　　During the encounter with Ruiz-Ramos, the officers attempted to raise someone in the

first floor apartment at 323 South Brighton.  Eventually the door was opened by Velasco-

Saldaña.  Thereafter, Velasco-Saldaña consented to allow the officers to enter the apartment,

---

[4]　　　The determination of when an encounter between law enforcement and a citizen
rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive
one which turns upon the unique facts of each case."  *Jones*, 269 F.3d at 925.  Nonetheless,
several matters have been considered by the courts and as summarized recently by the Eighth
Circuit:

> A request to see identification is not a seizure, as long as the police
> do not convey a message that compliance with their request[ ] is
> required..  There is no *per se* requirement that an officer inform a
> citizen of his right to refuse consent, and there is no presumption
> that consent is invalid where given without an explicit notification
> of the right to refuse.  That many people agree to speak with police
> when asked does not tend to suggest that reasonable persons do not
> feel free to decline:  While most citizens will respond to a police
> request, the fact that people do so, and do so without being told
> they are free not to respond, hardly eliminates the consensual
> nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations
omitted*).  Nor is a Fourth Amendment seizure instituted merely by a law enforcement requesting
permission to search a person's pockets, luggage, automobile, or, in this case, keys.  *See, e.g.,
United Stater v. Ortiz-Monroy*, 332 F.3d 525, 528 (8th Cir. 2003).

consented to the officers performing a protective sweep of the apartment, and then consented

(orally and in writing) to a search of the apartment by the officers.  Nonetheless, the defendants

argue that the ensuing search of the apartment at 323 South Brighton was unconstitutional.  The

defendants do not disagree that consent is a valid exception to the Fourth Amendment's warrant

requirement; instead, they argue that Velasco-Saldaña's consent was not voluntary.  The

defendants' argument is based largely on their accounts of the encounter which they characterize

as a police raid (shouting, guns drawn, the defendants ordered to remain still).  The Court,

however, does not find the defendants' account of the encounter to be credible.

The Fourth Amendment provides that "the right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated. . . ."  U.S. CONST. amend. IV.  As made clear in the Fourth Amendment, the

constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and

seizures.  *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960).  Nonetheless,

as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the
> common law, than the right of every individual to the possession
> and control of his own person, free from all restraint or
> interference of others, unless by clear and unquestionable authority
> of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as

reasonableness) is presumptively satisfied by a judicially-issued warrant.  However, over the

years, many exceptions to the warrant requirement have been recognized.  To that end, and of

importance to the search at 323 South Brighton, it is established law that an exception to the

18

warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-251, 111 S.Ct. 1801, 1804 (1991). However, it also well established that any such consent must be voluntary.

With regard to voluntariness, the <u>credible</u> evidence simply does not establish that law enforcement officers threatened, intimidated or coerced Velasco-Saldaña in obtaining his oral or written consent. The issue of " whether a consent to search was in fact voluntary or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct.2041, 2048-49 (1973). In that regard, "[t]he totality of the circumstances includes the characteristics of the person giving consent and the encounter from which the consent arose." *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998).

> Relevant characteristics of the consenting party include age, intelligence and education: chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation . . . . To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned, whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

*Id.* In this case, considering the totality of the circumstances, the Court concludes that Velasco-Saldaña's consent was voluntary. Velasco-Saldaña was told by the offices the purpose of the officers' visit, communicated without apparent difficulty with the officers, consented orally on two different instances (once for the protective sweep and again for the search of the apartment),

19

and signed a written consent to search form. There is no credible evidence that the agents were physically intimidating or made any promises to Velasco-Saldaña in exchange for his consent. Velasco-Saldaña's consent was freely given.

Merely because a suspect consents to a search, however, does not afford law enforcement an unfettered opportunity to disregard the constraints of the Fourth Amendment. Inasmuch as it falls within an established exception to the Fourth Amendment warrant requirement, "[a] consensual search may not exceed the scope of the consent given." *United States v. Randolph*, 970 F.2d 467, 468 (8th Cir. 1992). To that end:

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?

*Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1803-04. Moreover "[t]he scope of a [consensual] search is generally defined by its expressed object." *Id.* (*emphasis added*). In this case, the officers obtained permission to conduct a protective sweep of the apartment first and Velasco-Saldaña consented. As was thus appropriate, the officers limited that search to ascertaining whether any other individuals were present in the house. The officers only conducted a full search of the apartment after Velasco-Saldaña consented to such. Both searches were valid warrantless searches and the contraband discovered as a result of those searches should not be suppressed.

## B. The events at 430 Donnelly Avenue

Based on information obtained from a statement given by Ruiz-Ramos, on July 24, 2007, officers knocked on the door of the residence located at 430 Donnelly Avenue. The door was answered by Garcia-Bobadilla. The officers identified themselves to Garcia-Bobadilla and asked if they could come inside to talk and Garcia-Bobadilla told the officers that they could come in

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 20 of 32

to talk. The officers asked Garcia-Bobadilla if they could check the house to make sure that no one else was present and Garcia-Bobadilla said the officers could check. An officer then checked the residence and found Alfredo Cisneros-Gutierrez and Dheli Hernandez-Pena (a female) in the house. Based on the credible testimony[5] and in conformity with the case law discussed *supra*, the Court concludes that this search was a valid warrantless search based on Garcia-Bobadilla's consent and the search was appropriately limited to determining the presence of other individuals in the residence.

Likewise, considering the totality of the circumstances, the subsequent consent (both oral and written) of both Garcia-Bobadilla and Alfredo Cisneros-Gutierrez to conduct a full search of the residence was voluntary and knowing. Both Garcia-Bobadilla and Alfredo Cisneros-Gutierrez were told by officers the purpose of the officers' visit, communicated without apparent difficulty with the officers, consented orally, and signed written consents to search forms. There is no credible evidence that the agents were physically intimidating or made any promises to either Garcia-Bobadilla or Alfredo Cisneros-Gutierrez in exchange for their consent. The search was a valid warrantless search and contraband discovered therefrom should not be suppressed.

## C. The events at 3907 East 12th Terrace

Based on information obtained from a statement given by Dheli Hernandez-Pena, on July 24, 2007, officers knocked on the door of the residence located at 3907 East 12th Terrace. Unlike the prior "knock and talk" interactions involved in this case, the occupants at 3907 East 12th Terrace did not voluntarily allow law enforcement officers to enter the dwelling nor did the

---

[5]     Again, the Court concludes that the testimony of Special Agent King and Detective Ortiz was credible and that neither Garcia-Bobadilla nor Alfredo Cisneros-Gutierrez were subjected to intimidation or threats or coercion.

occupants consent to any search of the house.  To that end, the occupants (Gerardo Cisneros-Gutierrez and Alfonso Cisneros-Gutierrez) argue that the ensuing entry into and search of 3907 East 12th Terrace was unconstitutional inasmuch as the officers did not then have a warrant and the conditions did not establish any exception to the Fourth Amendment's requirement of a warrant.  The government argues that exigent circumstances justified the warrantless entry into 3907 East 12th Terrace.

Without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment.  *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000).  Those privacy interests are particularly enhanced when a search of an individual's domicile or residence is at issue.  *See*, *e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097 (1984) ("It is axiomatic that the physical entry of the house is the chief evil which the wording of the Fourth Amendment is directed.").  As protection for the citizen from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before undertaking a search of private property.  *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).   In this case, however, law enforcement officers did not seek or obtain a search warrant until after they had entered 3907 East 12th Terrace and observed incriminating materials.

While it is true in most cases that police officers may not enter or search a home without a warrant authorizing them to do so, it is nonetheless settled law, as well as common sense, that emergency circumstances may take precedence over traditional Fourth Amendment concerns and permit law enforcement officers to take actions that might otherwise require a warrant.

> Police officers may not enter or search a home without a warrant
> unless justified by exigent circumstances.  The exigent
> circumstances exception to the warrant requirement is narrowly

22

drawn. The exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed.

*United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Moreover, in assessing that danger, "[t]he question . . . is not whether there was actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Columbia*, 27 F.3d 1346, 1353 (8th Cir. 1994).

In this case, under the particular facts presented, the Court concludes that the law enforcement officers did reasonably perceive exigent circumstances at the time they made the decision to enter 3907 East 12th Terrace without a warrant and without the consent of the occupants. At time the officers made that decision:

> They had been informed by Ms. Hernandez-Pena that she was the girlfriend of Alfredo Cisneros-Gutierrez (whom the officers had just arrested), that she wanted to cooperate, that there was another house in Kansas City where Alfredo Cisneros-Gutierrez' brothers were living and where large amounts of drugs and a cache of weapons were kept, that she had personally observed the drugs and weapons in the house, and that the people were enforcers for a drug organization.

> They had arrived at the house and had been talking with Gerardo Cisneros-Gutierrez through a window because he would not come to the door.

> They believed that Gerardo Cisneros-Gutierrez was delaying them by being intentionally uncomprehending with respect to the officers' requests.

> They had observed a man inside the house conversing briefly with Gerardo Cisneros-Gutierrez before "scurrying" between rooms and seeming to flush substances down the kitchen sink.

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 23 of 32

Based on this evidence, an objectively reasonable officer on the scene could have believed that there was an exigency and that contraband inside of 3907 East 12th Terrace was being destroyed.[6]

However, the presence of exigent circumstances does not afford law enforcement officers *carte blanche* permission to undertake any actions. Instead, it is understood that when confronted with exigent circumstances involving the possible destruction of evidence, the officers' "entry must be limited in scope to the minimum intrusion necessary to prevent the destruction of evidence." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). In this case, the Court finds that the officers properly limited their conduct upon entry by securing the two known occupants and performing a cursory sweep of the house to make sure that no other individuals were in the dwelling. These steps insured that further destruction of evidence would cease. *See*, *e.g.*, *United States v. Jansen*, 470 F.3d 762, 765 (8th Cir. 2006) ("Police officers are able to conduct a protective sweep search pending an application for a search warrant when there is a risk that evidence will be destroyed.").

In the course of performing the protective sweep, officers noted several items in the house in plain view including an assault-styled weapon in a closet, plastic bags containing a

_____

[6]     The circumstances presented by the facts of this case are similar to those at issue in *United States v. Leveringston*, 397 F.3d 1112 (8th Cir. 2005), where the court found exigent circumstances justified a warrantless entry into a motel room.

> The [defendant] reacted to police knocking by looking through curtains, expressing surprise, and then immediately shutting the curtains. This response was followed by sounds of pots and pans slamming, dishes breaking, water flowing, and a garbage disposal running. The officers reasonably could infer that these sounds indicated the destruction of evidence of drug trafficking in response to the presence of the police.

*Id.* at 1116.

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 24 of 32

crystal-like substance, and a large amount of U.S. currency.  Thereafter, officers sought and obtained a search warrant for 3907 East 12th Terrace.  The defendants briefly argue that probable cause was lacking to support the issuance of the warrant.  The Court disagrees.

The role of a court reviewing a search warrant "is to ensure that the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant [and the] existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (*citations omitted*).  *See also  United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416 (1984) ("the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination" as to whether an affidavit establishes probable cause.).

Reviewing the affidavit supporting the issuance of this search warrant,[7] the Court has no difficulty in concluding that the search warrant was issued with the requisite probable cause.  Detective Ortiz' affidavit set forth the information received from Ms. Hernandez-Pena , the conduct and exigent circumstances observed by the officers at 3907 East 12th Terrace, and the contraband observed in plain sight by officers performing a protective sweep of the property.

### D.  The custodial interrogations of the defendants

All six of the defendants were interrogated by officers following their arrests.  The defendants seek to suppress their statements.  The Fifth Amendment of the United States

---

[7]        "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'"  *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir.1999) (*quoting United States v. Gladney*, 48 F.3d 309, 312 (8th Cir.1995)).

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 25 of 32

Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a

witness against himself." U.S. CONST. amend. V.  With regard to the Fifth Amendment, the

Supreme Court has found:

> The essence of this basic constitutional principle is the requirement
> that the [government] which proposes to convict and punish an
> individual produce the evidence against him by the independent
> labors of its officers, not by the simple, cruel expedient of forcing
> it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981).  However, as the Supreme

Court has made clear on numerous occasions, the right against self-incrimination does not

prohibit any and all statements made by suspects to law enforcement officers from being

admissible in a criminal proceeding.  For example:

> [The Fifth Amendment] does not preclude a witness from
> testifying voluntarily in matters which may incriminate him, . . .
> for those competent and freewilled to do so may give evidence
> against the whole world, themselves included. . . .  Indeed, far
> from being prohibited by the Constitution, admissions of guilt by
> wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977).  The touchstone of such

Fifth Amendment analysis is voluntariness.  *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct.

2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

    With regard to statements made by a suspect during custodial interrogation by law

enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86

S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness.  The reason for such

special treatment stems from the Supreme Court's recognition that custodial interrogations are

inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467

U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984).  Indeed, in *Miranda,* the Supreme Court observed

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 26 of 32

that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997) (*citing United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir.1995)); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit Court of Appeals explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the

> burden of proving that the defendant voluntarily and knowingly
> waived his rights.

*Id*. at 977 (*citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.

1993) (government bears burden of proving by preponderance of evidence that defendant

knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two

distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
>
> made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it.

*Id*. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding

the interrogation reveals both an uncoerced choice and the requisite level of comprehension may

a court properly conclude that the *Miranda* rights have been waived." *Id*.. These principles

subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212

F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate
> choice rather than intimidation, coercion, or deception. A waiver is
> knowing and intelligent if it has been made with a full awareness
> of both the nature of the right being abandoned and the
> consequences of the decision to abandon it.

*Id*. at 420.

In reviewing the totality of the circumstances surrounding the statements made by each of

the six defendants, the Court concludes that in each case the statements were made voluntarily

and the statements were made after voluntary, knowing and intelligent waivers of the

28

defendants' respective *Miranda* rights.  In this regard, the credible testimony of Special Agent King and Detective Ortiz more than satisfies the Government's burden of proof.

In addition, the Court briefly addresses two specific issues raised by the defendants in challenging the admissibility of their statements.  The defendants repeatedly note that the statements were not recorded by the Kansas City Missouri Police.  While the Eighth Circuit has not addressed the question directly in a holding, it has cited with approval, the findings of other courts regarding the necessity of recording law enforcement interviews with suspects:

> We note that, in federal criminal cases, other circuits have held that incriminating statements are not inadmissible simply because the police failed to record or take notes of the conversations.

*Jenner v. Smith*, 982 F.3d 329, 331 n.2, (8th Cir. 1993) (*citing United States v. Short*,  947 F.2d 1445, 1451 (10th Cir.1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680 (1992)).  *See also United States v. Valdez*, 880 F.2d 1230, 1233 (11th Cir.1989) (inculpatory statements admissible although officers failed to take notes or record statements); *United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir.1977) (FBI agent may testify regarding defendant's confession even though the agent did not electronically record the confession). While such a factor may be considered in the totality of circumstances in determining credibility and voluntariness, the Court will not recommend adopting a prophylactic rule suppressing all statements obtained by custodial interrogation that are not recorded.

In addition, one defendant (Gerardo Cisneros-Gutierrez) refused to sign a *Miranda* waiver form. However, with regard to the refusal to sign the *Miranda* form, the Eighth Circuit has long held that this fact does not, in and of itself, establish a lack of voluntariness.

> When the circumstances indicate that a defendant knew of his right to remain silent and to have counsel, yet intelligently waived that right by

29

> voluntarily answering questions, his refusal to sign a written waiver does
> not render a confession or an incriminating statement inadmissible.

*United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976). The Court concludes that, under

the totality of circumstances and the evidence presented, each of the six defendants knowingly

and voluntarily waived his rights and voluntarily gave statements to law enforcement officers.

Consequently, the Court does not recommend suppressing those statements under the Fifth

Amendment.[8]

Finally, the Court notes that, to varying degrees, some of the defendants appear to argue

that suppression is warranted in their case because of police conduct in dealing with another

defendant. However, it well established that Fourth Amendment and Fifth Amendment rights

are personal rights that may not be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133-34,

99 S.Ct. 421, 425 (1978) (Fourth Amendment); *United States v. Escobar*, 50 F.3d 1414, 1422 (8th

Cir.1995) (holding a defendant's *Miranda* rights are personal and a co-defendant lacks standing

to assert an alleged violation as a defense).

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and

applicable law, enter an order **DENYING** defendant Alfonso Cisneros-Gutierrez' AMENDED

MOTION TO SUPPRESS EVIDENCE filed October 24, 2007 (Doc. #65); and further

---

[8] In addition, because the Court finds the conduct of law enforcement officers to have been constitutionally permissible throughout, the Court does not recommend suppressing the defendants' statements or any other evidence seized as "fruit of the poisonous tree" *See*, *e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417 (1963).

Case 4:07-cr-00280-HFS   Document 102   Filed 04/30/08   Page 30 of 32

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** defendant Gerardo Cisneros-Gutierrez' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed October 14, 2007 (Doc. #56); and further

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** defendant Alfonso Cisneros-Gutierrez' AMENDED MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed October 15, 2007 (Doc. #57); and further

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** defendant Miguel Garcia-Bobadilla's MOTION TO SUPPRESS EVIDENCE filed October 30, 2007 (Doc. #67); and further

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** defendant Justino Ruiz-Ramos' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed August 29, 2007 (Doc. #50); and further

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** defendant Salvador Jesus Velasco-Saldaña's MOTION TO SUPPRESS EVIDENCE AND STATEMENTS filed August 28, 2007 (Doc. #48).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same.  A failure to file and

31

serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

_/s/ John T. Maughmer_
**John T. Maughmer**
**United States Magistrate Judge**